### AMERICAN TYPE FOUNDERS CO. v. J. M. NICHOLS.

#### No. 2526.    Delivered June 25, 1919.

#### (214 S. W., 391.)

**Laborer's Lien—Priority—Previous Mortgage.**

The lien given a laborer upon all property connected with the performance of his labor owned by or in possession of his employer, by the Act of May 27, 1897 (Laws, 25th Legis., p. 218) does not take precedence over a prior duly registered chattel mortgage of the same property. Mr. Justice HAWKINS, dissenting. (Pp. 6-9.)

Question certified from the Court of Civil Appeals for the Second District, in an appeal from Wise County.

*George Sergeant, Cecil L. Simpson,* and *R. E. Carswell,* for appellant.—A laborer's lien, under Section 3339-a of the Revised Statutes, is neither a prior nor a superior lien to a mortgage lien for purchase money, where the said mortgage lien was created and properly recorded before any portion of the indebtedness on which the laborer's lien is based, accrued. Ellis v. Water Co., 86 Texas, 109; Oriental H. Co. v. Griffith, 88 Texas, 574.

*McMurray & Getty,* for appellee.—The Statutes in question, Art. 3339a and 3339b, show a clear intention on the part of the Legislature to give priority and precedence to such laborers as shall fix and preserve their liens, over all other claims or liens except the landlord's lien; and this appellee having fixed, preserved, and foreclosed his laborer's lien in accordance with the provisions of said statute, his said claim so secured was entitled to be first satisfied out

of the said property covered by the lien. Norwood v. Leeves, 115 S. W., 53; Cash v. First Natl. Bank of McGregor, 61 S. W., 723; 26 Cyc., 1072-3, and cases there cited; Oriental Hotel Co. v. Griffith, 88 Texas, 574.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

Question certified from the Court of Civil Appeals of the Second Supreme Judicial District of Texas, in an appeal from the County Court of Wise County.

The Certificate of the Honorable Court of Civil Appeals is as follows:

·''TO THE HONORABLE SUPREME COURT OF TEXAS.

The above styled suit was instituted in the Justice's Court of Wise County by J. M. Nichols against R. B. Walker and the American Type Founders Company to recover the sum of one hundred and eleven dollars and fifteen cents with a foreclosure of lien claimed by plaintiff on one Chandler & Price Job Printing Press and one Fairbanks & Morse gasoline engine of the alleged value of one hundred and ninety dollars. The indebtedness claimed was for labor performed by the plaintiff for the defendant R. B. Walker as a printer and compositor and the printing press and engine were used by the plaintiff in the performance of such services. A judgment was rendered in the Justice Court in favor of the plaintiff for one hundred and six dollars and fifty cents with a foreclosure of lien claimed by him, from which judgment an appeal was prosecuted by the Type Founders Company to the County Court of Wise County where the suit was again tried, and from a judgment there rendered in favor of the plaintiff for the same relief awarded in the Justice Court an appeal has been duly perfected and prosecuted to this court by the American Type Founders Company.

The following facts were proven beyond controversy upon the trial. The plaintiff Nichols performed services as printer and compositor for defendant R. B. Walker who was engaged in operating a printing establishment doing job printing work and printing a newspaper in the town of Bridgeport and who had·bought the printing press and engine from the defendant American Type Founders Company. The services so performed by plaintiff Nichols were reasonably worth the amount for which he recovered judgment. He took the necessary steps required by Article 5645, Revised Statutes 1911, to fix the lien upon the printing press and engine provided for in Article 5644 of said Statute. Prior to the employment of Nichols by Walker the latter purchased the printing press and engine from the American Type Founders Company. As a part of the consideration for said sale Walker executed his several promissory notes aggregating the sum of eleven hundred and eighty dollars and

ninety-six cents and secured the same by a chattel mortgage upon the press and engine, which mortgage was forthwith duly filed for registration in the county clerk's office of Wise County. This mortgage was filed prior to the time Nichols began to work for Walker and the purchase money notes given by Walker have never been paid. The trial court held that the statutory lien fixed by the plaintiff upon the press and engine was superior to the appellant's mortgage lien and to this finding the appellant has assigned error. We have been cited to no decision by Your Honorable Court and have been unable to find any decisive of the question presented by this assignment and in view of the importance of that question, and of the further fact that the amount in controversy in this suit is not sufficient to give Your Honorable Court jurisdiction by writ of error, we have deemed it advisable to submit for Your Honors' determination whether or not the decision of the trial court upon the question above noted was correct."

We answer that the decision of the trial court was not correct.

The decision of the trial court can only be sustained by construing the act approved May 27, 1897 (10 Gammel's Laws of Texas, page 1272), as giving priority to the employes' liens specified in the act, over liens previously created, save in the single instance of the lien of the farm hand, in so far as it is subordinated to the lien of the landlord.

The act does not purport to give priority to the employers' liens, but merely provides for a first lien upon property created by the labor of the employees or necessarily connected with the performance thereof.

In 16 Ruling Case Law, at page 507, it is stated: "To protect the wages of employees, a variety of constitutional provisions and statutes have been adopted. . . . The liens given by such statutes are subordinate to prior liens, such as chattel mortgages, unless a different rule of priority is *expressly* prescribed."

We might rest our answer on the proposition that there is no express legislative declaration of priority for the employees' liens, in the absence of which there can be no displacement of existing and registered liens. Hedeman v. Newnom, 109 Tex. 472.

There is nothing in the statute, which could be held to confer express priority on the employees, save that the lien given to each of them is described as "a first lien." These words lose what might otherwise be their significance as implying priority over other liens, when we consider the words of similar Texas statutes, where no priority was given, and the words of similar Texas Statutes where priority was given.

Articles 5475 and 5490 of the Revised Statutes each give "a preference lien" on certain property to landlords. Yet, nothing is better settled in Texas than that this *preferred lien* is subordinate to pre-existing mortgages. Brackenridge v. Milam, 81 Texas, 17;

Assn. v. Cochran, 60 Texas, 625; Oakes v. Freeman, 204 S. W., 360; Burgher v. Barry, 211, S. W., 457.

Article 5664 of the Revised Statutes gives "a special lien" on certain animals and vehicles, for the charges against same, in favor of proprietors, owners and lessees of livery stables and pastures. Such special· liens attach, however, subject to subsisting mortgages. Masterson v. Pelz, 86 S. W., 56.

A comparison of the Act of May 27, 1897, with the Act of February 18, 1879, amended March 10, 1887, providing liens for railroad employees (8 Gammel's Laws of Texas, pp. 1308, 1309; Gammel's Laws of Texas, p. 815), leaves little room for doubt that there was no intention by the Legislature to make the employees' liens, conferred by the Act of 1897, "prior to all others." For, the Acts of February, 18, 1879, and March 10, 1887, dealt with a part of the same general subject-matter as the Act of May 27, 1897, that is, giving security for the payment of wages to employees, and the first two acts declare the liens therein specified "prior to all others," while the later act omits the words "prior to all others," as it omits any words of like plain and direct import, with respect to lien priorities. It is because the Act of February 18, 1879, as amended March 10, 1887, does contain the words "prior to all others" that railroad employees' liens have been adjudged superior to prior liens. Hubbell v. Texas Southern Ry. Co., 126 S. W., 317.

Just as the Legislature used plain and positive language when it was intended to make prior liens subordinate to statutory liens, before the passage of the act under consideration, so it has since used equally plain and positive language to accomplish that purpose.

The 33rd Legislature enacted the last amendment to the act under consideration, continuing to omit any words declaring the liens thereby protected superior to others. Acts Regular Session, 33rd Leg. 151. At the same session, the Legislature, by statute, gave persons furnishing water for purposes of irrigation a preference lien, on crops raised on irrigated lands, but, intending other liens to be subordinated, expressly declared that the statutory lien should be "superior to every other lien." Act approved April 9, 1913, Regular Session 33rd Leg., p. 377, Sec. 87; Bank & Trust Co. v. Smith, 108 Texas, 272. It cannot be lightly concluded that the Legislature, in the one instance, had in mind the necessity of plain and positive language to override subsisting rights, and, in the other instance, overlooked such necessity.

It is contended that the proviso in the statute that the lien given a farm hand shall be subordinate to the landlord's lien evidences the intent of the Legislature that all other liens shall be subordinate to the liens given farm hands and the other beneficiaries of the statute.

In our opinion, the proviso supports our construction of the statute. For, under the case of Brackenridge v. Milam, 1 Texas, 17,

it cannot be doubted that if a farm hand of a tenant were to use in the performance of the labor of his employment an implement in the possession of the tenant, furnished by the landlord, and previously mortgaged by the landlord, that if we declared the farm hand's lien superior to all others, save the landlord's, then the priorities of liens on the farm implement, as between the farm hand, landlord and mortgagee, would be as follows:

1st:   The farm hand's lien would be superior to the mortgagee's
2nd:   The mortgagee's lien would be superior to the landlord's.
3rd.   The landlord's lien would be superior to the farm hand's.

Under such a condition, no foreclosure would be possible, on the farm implement, in a controversy between all three of the named lien-holders.   For, the proceeds of sale of the implement could not be ordered paid first to the mortgagee, because the farm hand's lien would be superior to the mortgagee's.   Nor could such proceeds be ordered paid first to the landlord, because the mortgagee's lien would be superior to the landlord's.   Nor could such proceeds be ordered paid first to the farm hand, because the landlord's lien would be superior to the farm hand's.   It thus appears that unless the construction be given the statute, which we have placed upon it, the proviso thereof could not be enforced in practice.   Any conclusion, which cannot be applied in practice, is necessarily erroneous.

Article 3190 of the Revised Statutes of 1879, being article 5671 of the Revised Statutes of 1911, provides that nothing contained in the title "Liens," shall in any manner impair or affect the right of parties to create liens by special contract or agreement, nor to affect or impair other liens.   The Act of 1897 has always been carried in the Revised Statutes under the title of "Liens."

The article just mentioned reflects the long established public policy of the State that in the creation of statutory liens, other existing liens shall not be impaired, which, in our opinion, forbids that we impair subsisting and duly registered contract liens, by mere inference from such words as are found in the Act of 1897 and its amendments.

In California, it was provided by statute—not outright that contract liens should not be impaired as here—but that different liens should have priority according to the time of their creation, "other things being equal."   In refusing to give a laborer's lien priority, under this statute, over a pre-existing chattel mortgage on a crop, the Supreme Court of California said:  "The chattel mortgagee gave full value for her right of lien, and was first in point of time.   She notified all the world of her rights, and warned the world to deal with the property at their peril.   She made a contract expressly authorized by the law, and did all that the law demanded of her in order to preserve the fruits of her contract.   No court of equity can suggest a single defect in her conduct.   Upon the other hand, this appellant, with full knowledge of the existence of the

chattel mortgage, contracted to harvest the crops. He did this voluntarily, and if he suffers loss by such conduct it is his own fault. It was a matter of choice upon his part to do the work, and he assumed the risk of losing his hire when he entered into the contract." Wilson v. Donaldson, 121 Cal., 8, 66 Am. St. Rep., 18, 19.

While reasons can be assigned which might have induced the Legislature to give employees' liens priority over other existing liens, there are equally cogent reasons to sustain the failure to do so. Thus, in a case like this, save that there the laborer's claim was stronger than here because for labor in repairing the property sought to be subjected to the laborer's lien, the Supreme Court of Michigan said: "The mortgage was on file and defendants were therefore affected with notice. On general principles, it would seem that the lien so carefully reserved by the vendor, the person furnishing the entire original machine, ought to have priority over the subsequent repairers. The engine itself included all the labor and all the material necessary for its production, and when the plaintiff sold it he virtually furnished to his vendees that labor and those materials and preserved an express lien. The repairers did less. Their expenditure was comparatively small and they acted in making it under circumstances which charged them with notice of the plaintiff's prior lien. Why should their claim be preferred?" Denison v. Shuler, 47 Mich., 598, 41 Am. Rep., 735.

The final conclusion of the Michigan Supreme Court was the same as that we have announced, and it was embodied in the sentence: "Had it been intended that the kind of lien in question should operate retrospectively and override prior securities executed to secure purchase-money, it is not to be supposed that the Legislature would have left the purpose in any doubt." 41 Am. Rep., 736.

The effect of our decision is to subject to the employees' lien the property created by or necessarily connected with the performance of his labor, as that property stood at the time of his employment. But, we decline, in the absence of clear language requiring it, as have most of the courts of last resort in the United States, to extend the employees' lien so as to attach to, and diminish or destroy the interest or right of an innocent lien-holder, which had vested prior to the employment, and of which the employee was chargeable with notice. Note L. R. A., 1918C, 1024; Note L. R. A., 1915D, 1154; Wilson v. Donaldson, 66 Am. St. Rep., 18.

MR. JUSTICE HAWKINS delivered the following dissenting opinion.

The certified question calls for a determination of the order of priority as between a duly registered chattel mortgage lien upon a printing press and an engine, constituting portions of a printing office outfit, given to secure purchase money, and a subsequently arising duly fixed and duly sued upon statutory artisan's lien upon said printing press and said engine.

The decision of the trial court, that the statutory lien upon the press and engine was superior to the contract lien thereon, was, in

my opinion, unquestionably sound. That has been my conclusion upon each of three separate studies of the question which I have made since this case was submitted in this court on November 7, 1917, some delay in decision here having resulted from differences in opinion among members of this court.

The lien asserted by the compositor and printer, Nichols, arose under the following Act of May 27, 1897, which must be considered as a whole:

"An Act to protect accountants, bookkeepers, artisans, craftsman, factory operatives, mill operatives, servants, mechanics, quarrymen, common laborers, and farm hands; to provide a lien, and prescribe the time of payments, and in lawful money of the United States; and prescribing the rights of the assignees of such persons, and to repeal all laws in conflict with this act.

Section 1. Be it enacted by the Legislature of the State of Texas: That whenever any clerk, accountant, bookkeeper, artisan, craftsman, factory operative, mill operative, servant, mechanic, quarryman, or common laborer, farm hand, male or female, may labor or perform any service in any office, store, saloon, hotel, shop, mine, quarry, manufactory, or mill of any character, or on any farm, under or by virtue of any contract or agreement, written or verbal, with any person, employer, firm, corporation, or his, or her or their agent or agents, receiver or receivers, trustee or trustees, in order to secure the payment of the amount due by such contract or agreement, written or verbal, the hereinbefore mentioned employees shall have a first lien upon all products, machinery, tools, fixtures, appurtenances, goods, wares, merchandise, chattels, or thing or things of value of whatsoever character that may be created in whole or in part by the labor of such persons or necessarily connected with the performance of such labor or service, which may be owned by or in the possession of the aforesaid employer, person, firm, corporation, or his, or her or their agent or agents, receiver or receivers, trustee or trustees; provided, that the lien herein given to a farm hand shall be subordinate to the landlord's lien now provided by law.

Sec. 2. Whenever any person, employer, firm, corporation, his, her, or their agent or agents, receiver or receivers, trustee or trustees, shall fail or refuse to make payments as hereinafter prescribed in this act, the said clerk, accountant, bookkeeper, farm hand, artisan, craftsman, operative, servant, mechanic, quarryman, or laborer, who shall have performed service of any character, shall make or have made duplicate accounts of such service, with the amount due him or her for the same, and present or have presented, to aforesaid employer, person, firm or corporation, his, her or their agent or agents, receiver or receivers, trustee or trustees, one of the aforesaid duplicate accounts within thirty days after the said indebtedness shall have accrued. The other of the said duplicate accounts shall, within the time hereinbefore prescribed, be filed with the county

clerk of the county in which said service was rendered, and shall be recorded by the county clerk in a book kept for that purpose. · The party or parties presenting the aforesaid account shall make affidavit as to the correctness of the same. A compliance with the foregoing requirements in this section shall be necessary to fix and preserve the lien given under this act; and the liens of different persons shall take precedence in the order in which they are filed; provided, that all persons claiming the benefit of this act shall have six months within which to bring suit to foreclose the aforesaid lien; and provided, further, that a substantial compliance with the provisions of this section shall be deemed sufficient diligence to fix and secure the lien hereinbefore given; provided, that any purchaser of such products from the owner thereof shall acquire a good title thereto, unless he has at the time of the purchase actual or constructive notice of the claim of such lien holder upon such products, said constructive notice to be given by record of such claim, as provided for in this act, or by suit filed.

Sec. 3. Under the operations of this act, all wages, if service is by agreement performed by the day or week, shall be due and payable weekly, or if by the month, shall be due and payable monthly. All payments to be made in lawful money of the United States.

Sec. 4. Any of the parties named in Section 1 of this act, may transfer or assign their rights hereunder, and their assignee or assignees shall have the same rights and privileges as are conferred upon such persons enumerated in Section 1.

Sec. 5. The lien created by this act shall cease to be operative after six months after the same is fixed, unless suit is brought within said time to enforce such lien.

Sec. 6. All laws and parts of laws in conflict with the provisions of this act, be and the same are hereby repealed; provided, that this act shall not be so construed as to repeal Chapter 2, of Title LXVI, of the Revised Civil Statutes of Texas, relating to liens of mechanics, contractors, builders, and materialmen.

Sec. 8 (7). It being important that the benefits of this act be realized at once, because the parties to be benefitted by this act have no adequate protection under existing laws, creates an imperative public necessity that the constitutional rule requiring bills to be read on three several days should be suspended." General Laws Twenty-fifth Legislature, p. 218, 10 Gam. L. 1272.

An important feature of this case, which should be borne in mind constantly, is the fact that said Act was in force when said press and said engine were sold to Walker and when said chattel mortgage thereon was executed and delivered by him. Because of that fact said statute must be presumed to have been in contemplation of both parties to that transaction; consequently, on principle and under the authorities, and very clearly, this case does not involve any interference with vested rights of a prior mortgagee. Unques-

tionably the matter of priority as between future contract liens and subsequently inuring statutory liens was entirely one of legislative discretion and provision.

Both the contract lien and the statutory lien which are here involved arose prior to the amendatory Act of March 31, 1913, ch. 80, p. 151, Arts. 5644-5644a, Vernon's Sayles' Civ. Stats; hence the present issue of priority is not affected by that later statute.

By delivering to the vendee possession of said property the vendor waived all advantage growing out of ownership and sale thereof. The fact that the chattel mortgage lien was to secure payment of purchase money adds nothing whatever to its legal effect or *status.* Art. 5655, R. S. 1911; Harling v. Creech, 88 Texas, 300, 31 S. W., 357; Parlin & Orendorff v. Davis, 74 S.W., 952. By the stated transactions said vendor voluntarily assumed the *status* of any other mortgagee.

Thus the issue narrows to a construction and application of said original statute.

Such chattel mortgage liens are not within any exception or limitation expressly defined in said Act of 1897, and, consequently, are, unquestionably, within the terms of and subject to the operation of said Act, whatever its legal effect may be found to be.

My judgment is that in the enactment of said statute the general purpose of the Legislature obviously was to provide a lien which in reality should be "a first lien" in the fullest sense consistent with the Constitution of the United States, the Constitution of Texas, and the exceptions or limitations expressly set out in the provisos in sections 1 and 6, respectively. Such express exceptions or limitations include, of course, such others as necessarily arise therefrom by implication—as, for instance, concerning the *status* of the lien of the farm hand as related to the lien of a landlord and the lien of a prior chattel mortgage. That general purpose is expressed in the statute too clearly to be reasoned away on any theory of public policy or general legislative custom. Such general purpose will be treated separately, hereinafter, without constant reiteration of the subsidiary feature arising from implication.

The legislative intent may be ascertained most appropriately from (a) the phraseology of the Act itself, (b) the settled construction previously given by courts of last resort of other States to similar statutes, and (c) analogies arising from other statutes of this State which confer liens.

The first rule prescribed by our Revised Statutes to "govern in the construction of all civil statutory enactments" is: The ordinary signification shall be applied to words, except words of art or words connected with a particular trade or subject-matter, when they shall have the signification attached to them by experts in such art or trade, or with reference to such subject-matter." Art. 5502. That plain and simple requirement of law seems applicable, with controll-

ing force, to the inquiry now before this court. Disregard of it leaves the Legislature at the mercy of the judiciary or impels use by the Legislature of redundant expressions which that statutory rule was designed to prevent.

Upon the face of said Act of 1897 the meaning of the words expressly creating the lien therein provided and substantially declaring its priority over any and all other liens arising after the taking effect of that Act, excepting only certain therein designated classes of *statutory* liens, seems really too plain for serious argument. Especially is that true in the light of our statutory rules of construction and the utter absence from said Act itself of any term or provision indicating that any word therein employed was used in any sense outside of its ordinary signification.

Under such circumstances such decisions from other States, although disclosing a similar legislative purpose in similar and earlier statutes, lend only cumulative force to my stated conclusion concerning priority; and the policy reflected by laws enacted by previous Legislatures of this State, declaring or withholding priority of other statutory liens, being subject to change by any subsequent Legislature, necessarily is of minor consequence.

Undeniably the conclusion of the majority of this court that in this instance the asserted statutory lien is inferior to the asserted *contract* lien finds no support whatever in said Act itself. Not within its four corners, from captain to emergency clause, can there be found one syllable which reasonably suggests the idea that the Legislature did not fully grasp the subject or did not realize the full significance of every word in said Act. Necessarily it is upon other considerations, *entirely apart from the phraseology of said Act itself*, that the decision of the majority in this case rests. Upon those who thus ascribe to that statute a legal effect in direct conflict with that which its terms and provisions both expressly declare and plainly imply, very clearly rest both the responsibility and the burden of showing that by said statute the Legislature did not mean what it very plainly said, but, on the contrary, did mean something which it did not say, and that the two deliberate attempts which the Legislature made therein, *by provisos*, to define, expressly, exceptions to or limitations upon the full operation and legal effect of the new class of lien therein provided was not exhaustive of that field. Tompkins v. McKinney, 93 Texas, 631, 57 S. W., 804.

The express declaration of said statute is that the lien thereby provided shall be "a first lien" upon the property to be covered by it. That quoted language could not well be more specific, or clearer, or less ambiguous. That which is "first" cannot be second, or third, or in any sense *subordinate*.. As applied to liens the word "first" has a very definite and generally well understood meaning, about which the Legislature hardly could have been mistaken. If the adjective there employed were not designed to give unquestionable pri-

macy and priority to that lien (except as otherwise expressly stipulated in the Act itself), why was it used? What does it signify, and what is its contemplated function? To deny that quoted adjective that legal effect is to declare it meaningless, by mere judicial *fiat,* and in practice, to strike it from the Act—a thing which is not necessary. in this instance, in order to render the statute intelligible and operable. A cardinal and generally recognized rule of statutory construction, which long was followed by this court, is that, wherever possible, effect should be given to every word of the statute, the only permissible exception being when necessity requires otherwise in order to preserve and carry into operation the evident purpose of the Legislature. 15 Michie's Ency. Dig. Tex. Rep., "Statutes—Construction," pp. 961-6, citing many decisions of this court.

My conclusion that said statute was intended to provide a lien superior to any and all other liens accruing after said Act should take effect, save and except only certain therein designated classes of *statutory* liens, is supported, strongly, by the terms of the two provisos. In neither of them, and not elsewhere in said Act, was there expressly declared any exception or limitation whatever with reference to *any contract lien.* Each of the enumerated exceptions or limitations carried by said Act related, exclusively, to some other class of lien which, also, was given by law, rather than by *contract.*

Each of said provisos has a double legal effect. Primarily they enumerate, expressly, certain exceptions to or limitations upon the full and prior operation of the lien which said Act provides; but, by implication, they declare, also, that the operation of that lien as "a first lien" shall not be otherwise restricted or limited except, of course, in so far as may be necessary to conform the operation of a proviso to the general purpose of the act.

Thus the farm hand proviso not only expressly fixes the *status* of his lien as related to the landlord's lien and to the liens referred to in sections 6, and, by implication, fixes the *status* of the farm hand's lien as related to liens clearly superior to the landlord's lien, but, by implication, plainly provides, also, that liens given by said Act to beneficiaries other than farm hands shall not be subordinated to the landlord's lien.

Similar reasoning is applicable, largely, to the proviso concerning "liens of mechanics, contractors, builders, and materialmen." Thus laws conferring those classes of liens were continued in full force, and, in so expressly recognizing the priority of those liens the Legislature impliedly declared the priority of the lien conferred by said Act of 1897 over any and all other classes of thereafter inuring liens, whether statutory or contractual, save and except as stipulated, expressly or by implication, in the proviso in Section 1. Thus each of said provisos throws light upon the meaning of the other and both emphasize the unequivocal declaration of the Act that the lien thereby given shall be "a first lien."

Logically and fairly that line of reasoning should be applied in dealing with mortgage liens upon personal property covered by said statute, executed after it became operative but before the inception of a lien by virtue of its provisions. As applied to a printer, and perhaps as applied to any beneficiary of said Act of 1897 other than a farm hand, the effect necessarily would be to disclose that, inasmuch as chattel mortgage liens are not expressly mentioned in either of said provisos in the nature of an exception or limitation, the legislative purpose was to make the lien provided by said Act of 1897 in truth and in practice "a first lien" and therefore superior to such chattel mortgage lien.

My consideration for a coordinate department of the State government impels me to assume that if the general purpose of the Legislature had been to subordinate the lien then being provided by law to any *contractual* lien, such as said chattel mortgage lien, that purpose would have been manifested, clearly, by some express declaration to that effect in one or the other of said two provisos or elsewhere in said Act. But nowhere does it provide, expressly, that the lien therein conferred was to be in any sense subordinate to any subsequently inuring *contract* lien whatsoever, and no suggestion of that sort is carried by the Act save and except as related to a farm hand, and as to him such suggestion arises by implication only, flowing from the express proviso that his lien shall be subordinate to the lien of the landlord.   That implication as to a single class of beneficiaries should not be extended to defeat the lien conferred by the general terms of the Act upon other classes of beneficaries who are not embraced by the proviso in Section one.

The unambiguous declaration and certain intent of the law being, therefore, that the lien so conferred upon a compositor and printer shall be indeed "a first lien" why should not this court apply that law as it is written? Words are things of meaning, pregnant with vital force, and charged and surcharged with dynamic power. Must the Legislature clinch *every* nail it drives? It seems so, but I regard that as extremely unfortunate.   A specific legislative declaration that a lien thereby given shall be "superior to all other liens" should not be held to commit subsequent Legislatures to precisely the same phraseology in order to give like legal effect to a lien of a different kind, and much less should mere forms of expression in statutes control in construction of earlier statutes.   Subject to only certain restrictions which are in no sense applicable here, each Legislature, in turn, is vested by our State Constitution with full power and discretion in making laws, without being bound or hampered by Acts or expressions of other Legislatures, and each, in turn, is alike, free to employ language of its own selection in creating liens and in giving priority to them.   All that is necessary is that the language of the Acts shall fairly disclose the legislative intent.  Said Act of 1897 substantially

meets that requirement, expressly in description of the lien thereby given, and by reasonable and consistent implication in said provisos.

The policy of the law, if without regard to it the legislative intent be fairly ascertainable, is not in any sense a subject of judicial concern. The proper function of the courts, in determining the rights of litigants, is indeed, to try out the very purpose and intendment of the law; but where, as in this instance, the law as it is written is perfectly plain and wholly unambiguous there is no room for judicial construction. Ry. v. State, 81 Texas, 572, 17 S. W., 67; Fire Assn. v. Love, 101 Texas, 376, 108 S. W., 158; Schloss v. Ry., 85 Texas, 601, 22 S. W., 1014; Lewis v. United States, 92 U. S., 621.

In Schloss v. Ry., this court said: 'There is no ambiguity in the act, and its meaning must be determined by its own language. There is no room for construction, and no need to resort to extraneous facts for its interpretation. Suth. on Stat. Con., sec. 219; Engleking v. Von Wamel, 26 Texas, 471; Dodson v. Bunton, 81 Texas, 655.''

In Lewis v. United States the Supreme Court of the United States said: ''Where the language of a statute is transparent, and its meaning clear, there is no room for the office of construction. There should be no construction where there is nothing to construe. United States v. Wilberger, 5 Wheat., 95; Cherokee Tobacco, 11 Wall., 621. The Bankrupt Law declares that the United States shall be first paid; the fifth section of the statute of 1797 enacts, that, where there is a debt and bankruptcy, they shall have priority of payment. Neither statute contains any qualification, and we can interpolate none. Our duty is to execute the law as we find it; not to make it.''

In all such instances the policy of the law, as therein plainly shown, should be given full effect, even though it constitutes a radical departure from time honored policies of former days upon kindred subjects. Under no other conditions may the Legislature freely exercise its constitutional powers.

In my opinion this court is utterly destitute of authority to engraft upon the lien given by said Act of 1897 any exception or restriction or limitation whatsoever in addition to those therein expressly enumerated or plainly implied. McAnelly v. Ward Bros., 72 Texas, 342, 12 S. W., 206; Summers v. Davis, 49 Texas, 541; Turner v. Cross, 83 Texas, 218, 18 S. W., 578. In Ry. v. Cross, this court, through STAYTON, C. J., said: ''It is the duty of a court to give to language used in a statute the meaning with which it was used by the Legislature, if this can be ascertained; and to do this, if the words used be not such as have a peculiar meaning when applied to a given art or trade with reference to which they are used in the statute, the only safe rule is to apply to them their ordinary meaning, for the Legislature must be presumed to have

used them in that sense in which they are ordinarily understood; and if so applying them the legislation in which they are found seems to be harsh or not to embrace and give remedies for acts for which remedies ought to be given, the courts for such reasons are not authorized to place on them a forced construction for the purpose of mitigating a seeming hardship imposed by a statute, or conferring a right which the Legislature has not thought proper to give. It is the duty of a court to administer the law as it is written, and not to make the law; and however harsh a statute may seem to be, or whatever may seem to be its omissions, courts cannot on such considerations by construction restrain its operation or make it apply to cases to which it does not apply, without assuming functions that pertain solely to the legislative department of the government.''

This the decision of the majority, in the case at bar, which virtually reads into said statute of 1897 an additional exception or limitation which includes as to others than a farm hand, a *contract* lien, the same being said chattel mortgage lien, constitutes, it seems to me, a clear though unintentional judicial usurpation of purely legislative power and authority—a thing which our State Constitution expressly forbids. Art. 2, Sec. 1.

The point upon which this case turns seems not to have been decided by this court; but two of our Courts of Civil Appeals have construed said Act of 1897 in harmony with my herein expressed views concerning its legal effect as related to priorities. Cash v. Bank, 61 S. W., 723; Norwood v. Leeves, 115 S. W., 55. In Cash v. Bank, the appellant asserted, under said Act, a farm hand's lien upon corn which was covered by two earlier chattel mortgages in favor of the bank. The record in that appeal shows, although the published report does not, that said mortgages were both executed and filed for registration prior to the beginning of the term of employment. The bank contended that its mortgage lien was superior to said laborer's lien under said Act. The trial court therein held that, for all except the last month of service, the statutory lien inured, under the facts, in favor of the laborer, and that it was superior to said mortgage lien. Our Court of Civil Appeals, for the Third District, through Chief Justice Fisher, held that the statutory lien inured for the entire term of employment, and was superior to said mortgage lien; and that court rendered judgment, accordingly, ''in appellant's favor against the bank.'' In Norwood v. Leeves, an injunction case, our Court of Civil Appeals for the Sixth District said:

''It evidently was contemplated between them that the operation of the mill should be continued by Norwood and J. B. Newby, and that in its operation the timber should be manufactured into lumber. If it was so contemplated, then the parties must have further contemplated that liens for wages of operatives might be created against

property covered by the mortgage, so as to be entitled to precedence over the lien of the mortgage, for it could hardly have been contemplated that the mill might be operated without the creation of such liens. Sayles' Ann. Civ. St. 1897, arts. 3339a to 3339f.''

Prior to said Act of 1897, here under review, substantially similar laws, providing liens in favor of artisans, etc., had been adopted and had been construed by courts of last resort in various other States. Under a well established and generally observed rule of statutory construction it should be presumed by the courts of this State that our own Legislature considered those earlier statutes commendable examples and in said Act of 1897 undertook substantially to follow them with the construction which already had been so placed upon them. That rule is founded in reason, and is supported by overwhelming authority in the text books and in numerous decisions, including various decisions of our own Supreme Court. Green v. G. U. O. Odd Fellows, 106 Texas, 238, 163 S. W., 1071; City of Tyler v. Railway Co., 99 Texas, 497, 91 S. W., 1.

In a great majority of such decided cases from other States, construing such lien statutes, and, indeed, with but few exceptions, those earlier statutes were construed just as I herein construe, and would apply, said Act of 1897.

Under the Mississippi statute of April 5, 1872, giving to a laborer a ''first lien in law'' upon the crop which his labor helps to produce, such lien was held paramount to a mortgage on such crop executed by the land owner to enable him to make such crop, the mortgage being executed *after the statute became operative but before the term of employment of such laborer began,* the laborer having actual notice of such mortgage. In construing that statute the Supreme Court of Mississippi, in 1874, said: ''It is denominated 'a first lien in law;' to give it, therefore, the virtue and force intended by the statute, it must take effect as a limitation or restriction upon the power of the employer, by contract, mortgage, or by other act to defeat this first lien created by the law, to secure the wages of the laborer, out of the fruits of his industry.'' Buck v. Paine, 50 Miss., 648; 52 Miss. 271.

To similar effect are Leak v. Cook, 52 Miss., 799, and Herman v. Perkins, 52 Miss., 813, decided by the same court in the same year.

What, pray, under our statutory practice, blending law and equity, is the substantial difference between our ''first lien,'' as given by said Act of 1897, and the ''first lien in law'' so given by said earlier Mississippi statute? None; absolutely none. Consequently the effect of the majority decision in the present case is utterly to ignore the last above mentioned rule of construction, although observance and application of it certainly would give to our later statute a legal effect in complete harmony with every word in it.

An Arkansas statute of 1868 gave to laborers ''an absolute lien on the production of their labor.'' By an Act of 1895 such lien was

so extended as to include, also, any object or thing upon which the laborer worked for the price of his labor. In a subsequent case, presenting a contest between a laborer who claimed a lien on cotton for the price of his labor in producing it and merchants who claimed a lien on the cotton by virtue of a mortgage for supplies furnished the crop owner, the Supreme Court of that State declared, in 1905, that said later Act "*did not change the law* so far as such a laborer is concerned," and held that "the lien of this laborer was superior to that of the mortgagee who furnished the supplies to raise the crop." Sheeks-Stevens Store Company v. Richardson, 76 Ark., 282, 88 S. W., 983.

The phraseology of said statute is not disclosed by the report of that case; but from the session Acts I find that it declared "That all laborers who shall perform work and labor for any person under a written or verbal contract, if unpaid for the same, shall have an absolute lien on the production of their labor for such work and labor." Acts 1868, p. 224, No. 64, Sec. 1.

It will be observed, first, that said decision is to the effect that the entire matter of priorities in liens was within the control and direction of the Legislature, and, second, that said earlier statute of that adjoining State, which defined the lien of the laborer as "an absolute lien" was construed and upheld and applied by the Supreme Court of that State as giving a first and prior lien, "superior to that of the mortgagee who furnished the supplies to raise the crop."

In what material respect does said earlier Arkansas "absolute lien" differ, in quality and character from our Texas "first lien?" Between them I can see no difference, in principle. The difference between those quoted expressions is negligible, even though the stipulated exceptions to the full operation of the respective liens are materially different. Said Act of 1868 does declare "that a laborer's lien shall always be preferred to a landlord's, and no mortgage, sale or transfer without actual possession of the property, nor any mortgage sale or transfer with a notice of the laborer's lien, with actual possession of the property, shall in any way defeat or impair a laborer's lien." Sec. 19. But in so far as the question now before this court is concerned, that section merely emphasizes the correctness of the conclusion that in giving to the laborer "an absolute lien," the Legislature meant to endow it with priority over other statutory liens and other contract liens except as otherwise specially provided in said Act itself.

An Iowa statute of 1890 provided: "That hereafter, when the property of any company, corporation, firm, or person shall be seized upon by any process of any court of this State; or when their business shall be suspended by the action of creditors or be put into the hands of a receiver or trustee, then in all such cases, the debts owing to laborers or servants, which have accrued by reason of their labor or employment, to an amount not exceeding one hundred

dollars to each employee, for work or labor performed within ninety days next preceding the service or transfer of such property, shall be considered and treated as preferred debts, and such laborers or employees shall be preferred creditors, and shall first be paid in full; and if there be not sufficient to pay them in full, then the same shall be paid to them *pro rata* after paying costs." Acts 23 Gen. Assembly, ch. 48. Thereunder, in 1894, the Supreme Court of Iowa held such claims of laborers entitled to priority over mortgages existing when the business is so suspended, saying: "It is well known that in cases of such failure employees, because of the smallness of the amount usually due to them as wages, and their confidence in their employer, are the last to demand security, or to proceed against him by legal processes. It is a matter of common observation that in such cases other creditors usually consume the assets to the exclusion of the employees, whose dues, though small, are of great importance to them. The evident purpose of this statute is the better protection of the wage-working class of creditors. To this end it is provided that wages not exceeding one hundred dollars, earned within ninety days preceding the seizure or transfer of the property, shall be treated as preferred debts, and that the laborer as a preferred creditor, 'shall first be paid in full.' This preference is grounded upon the broadest equity, for this class of creditors usually contributes to create, enhance, or preserve the assets from which the debts are to be paid. It is contended that no lien is given to the laborer, that to give him preference over existing liens is to displace such liens, and that the preference only applies to what is left after satisfying existing liens. To so construe this statute would largely defeat its manifest purpose. . . . The preference given in the statute would usually be a barren privilege if deferred to prior existing liens. The purpose of the statute is made plain by the provision that these preferred creditors 'shall first be paid in full,'—a purpose that is emphasized by the concluding provision that they shall be paid by the person or court receiving their statement 'after first paying all costs occasioned by the seizure of such property out of the proceeds of the sale of the property seized.' " Reynolds v. Black, 91 Iowa, 1, 58 N. W., 922. And in 1895, in construing the same statute, the same court said: "Construing the whole section, we think it is manifest that the intent of the Legislature was to prefer the amounts due labor claimants, who bring themselves within the provisions of the act, to that of all creditors. . . . The laborers' claims we have held to be liens to be preferred to pre-existing mortgage liens. Reynolds v. Black, (Iowa) 58 N. W., 922. It seems to us, therefore, that as to the trust deed or mortgage, and any fees provided for *therein* or *arising thereunder*, these claims of laborers must be held to be preferred." St. Paul Co. v. Coal Co., 95 Iowa, 551, 64 N. W., 606.

In 1899, under the same statute, upon an issue of priority as between a laborer as engineer on a steam thresher, and a chattel mort-

gage for purchase money thereon, executed and recorded before the employment of the engineer began, it was held that the claimant under the mortgage was not entitled to priority and that the lien of the engineer was entitled to preference; citing Reynolds v. Black, *supra.* Goodenow v. Foster, 108 Iowa, 508, 79 N. W., 288. The opinion of the court alluded to the fact that the statute did not limit the right of the laborer to labor performed in the betterment of the property. See, also, Haw v. Burch, 110 Iowa, 234.

Sec. 2992 of the Iowa Code gave the landlord "a lien for his rent upon all crops grown upon the leased premises." Sec. 4019 provided that "when the property of any person shall be seized upon by any process of any court, . . . the debts owing the employees for labor performed within 90 days next preceding the seizure, . . . to an amount not exceeding $100 to each person, shall be a preferred debt and paid in full." Sec. 4022 provided "claims of employees for labor, if not contested, or if allowed after contest, shall have priority over all claims against or liens upon such property, except prior mechanics' liens for labor in opening and developing coal mines as allowed by law." Under said statutes and in attachment proceedings by a landlord against his tenant, the Supreme Court of Iowa held, in 1900, that the lien of the tenant's employee on the crop for wages was superior to that of the landlord, saying: "the Legislature has, in plain and unambiguous language, made the claims for labor superior to the landlord's lien, so that there is no room for construction." And the court added this: "We deem these statutes, protecting the wage earner, who usually contributes to preserve, enhance, or create the property seized, just and equitable, and they should receive a fair and liberal interpretation. Reynolds v. Black, *supra;* Bass v. Doerman, 112 Ind. Sup., 390, (14 N. E., 377); Bank v. Black, 129 Ind. Sup., 539 (29 N. E., 396). But for them, because of the comparatively small amount owing each laborer and his financial inability to protect this in litigation, he would be without any practicable remedy." Stuart v. Twining, 112 Iowa, 154. See, also, In re Byrne, 97 Fed., 762.

So, in the case at bar under our Texas statute, the work of the compositor and printer by means of the press and engine, assisted his employer in paying his notes secured by the mortgage on them. Evidently, in the decision of this case, my associates have wholly missed the viewpoint of our Legislature of 1897.

In 1905, under said Sec. 4019, in a case wherein a landlord's attachment was levied upon a printing press, the vendors of the press intervened, asserting a mortgage thereon, for purchase money. Held: The lien of the labor claimants was superior to the claim of the mortgage creditor. Anundsen v. Standard Printing Co., 129 Iowa, 200, 105 N. W., 424.

Wells v. Kelly, 121 Iowa, 577, decided in 1903, arose under said section 4019 of the Iowa Code, as amended. In that case a mort-

gagee, through an agent, seized, advertised, and sold mortgaged property belonging to a corporation, the proceeds being turned over to the mortgagee. After the seizure, but prior to the sale, a laborer, claiming preference under said law, filed with said agent a written notice of his claim for labor done for the mortgagor within ninety days prior to the seizure of the property. It was held that the filing of the notice did not create or make effective a lien upon the fund derived from the foreclosure sale, inasmuch as the claim was no longer within the terms of said statute, from which there had been eliminated the clause which formerly had extended such preference rights as against the property of corporations "when their business shall be suspended by the action of creditors." However, the reasoning upon which the decision rested showed that, but for such repeal, the claim of the laborer to a preference lien would have been upheld; consequently, in so far as it is applicable here, that case supports my conclusion as to the legal effect of the Texas statute of 1897.

An Indiana statute of 1879, (sec. 5206 R. S. 1881), provided, in substance, that when the property of one engaged in any manufacturing or mechanical business or in the construction of any work or building shall be seized by court process, or the business suspended by creditors, or put into the hands of an assignee, receiver or trustee, debts for wages to laborers or employees, up to $50, earned within six months, "shall be considered and treated as preferred debts and such laborers or employees shall be preferred creditors, and shall be first paid in full." The statute is like the above mentioned Iowa statute. Subsequently, certain employers belonging to one of the designated classes, becoming insolvent, and being threatened with suits, conveyed and transferred to certain general creditors all of the firm property. Thereafter certain laborers who had been employed by the firm attempted to assert, under said statute and upon said property, liens for their wages. Declaring that the business of the firm had been "suspended by the action of creditors" within the meaning of the statute, the court held, in 1877, that the ownership of said property by said transferees thereof was "subject to the payment of the preferred debts" so owing to the laborers in sums not exceeding the statutory amount. Bass v. Doerman, 112 Ind., 390.

In construing the same statute, Sec. 7051, Burn's R. S. 1894, it was held, in 1896, that such statutory lien was superior to the lien of a prior chattel mortgage, and attached to the chattels although they had been transferred by the employer to the mortgagee in the payment of the debt. Bell v. Hiner, 16 Ind. App., 184, 44 N. E., 576. Therein the court said: "The statute it is true does not in terms create any express lien *eo nomine,* but the Supreme Court in Bass v. Doerman, 112 Ind., 390, decided that by this statute a lien was given to the laborer superior to the rights of, and enforceable

against, one to whom the property of the insolvent debtor was sold in payment of debts due the purchaser, where the business of the debtor was by such action of the creditor thereby suspended. The court's liberal construction of this statute has been approved in subsequent cases (citing them). . . . In State, ex rel. v. Aetna Life Ins. Co., 117 Ind., 251, it is said by Elliott, J., when considering the question of superiority of a statutory lien over a prior mortgage lien: 'The statute must determine the character and extent of the lien . . . It is not necessary that it should, in express terms, declare that the lien shall be a paramount one, for if the intention can be gathered from the general words and purposes of the statute, the courts will give it effect.' This is in harmony with the principle asserted by the Supreme Court of Massachusetts, which says, in Dunklee v. Crane, 103 Mass., 470. ''The statute contains no express provisions that the lien shall attach and have priority over mortgages and other incumbrances created after the contract, but such is the necessary implication.' It also accords with City of Paterson v. O'Neill, 32 N. J. Eq., 386. . . . When the mortgagee accepted his mortgage, he must be deemed to have done so with knowledge that if the business was continued, and the contingency contemplated by the statute should occur, then the labor debts would be preferred and must be first paid. The law entered into the mortgage contract as a silent but potent factor, and the mortgagee accepted it subject to such rights as might accrue to others under the law (citing cases). . . . It is wholly voluntary upon the part of the mortgagee whether he will accept the mortgage with the limitations by law incorporated therein. . . . The principle upon which a mortgage is subordinated to a statutory lien authorized and made superior by a statute in force when the mortgage is executed is not by any means new or novel. Nor does Indiana stand alone in thus providing security for the wage earners who depend upon their daily toil for support. For many centuries, in admiralty, the rights of seamen to their wages have been held superior to the mortgagees of the vessel. The J. A. Brown, 2 Lowell, 464; 2 Jones on Liens, section 1775. In Mississippi the liens of agricultural laborers are made superior to prior mortgages. Buck v. Payne, 52 Miss. 271; Buck v. Paine, 50 Miss., 648. In Michigan all the wages of miners are given liens paramount to all others. McLaren v. Byrnes, 80 Mich., 275, 45 N. W., 143.''

Under the same Indiana statute of 1879 it was held, in 1901, that the lien of twelve printers upon a newspaper plant, consisting of presses, machinery, type, furniture, etc., was superior to the rights of those who had purchased said property at foreclosure sale thereof under two mortgages thereon which had been executed and filed prior to the inception of the laborers' lien, one of said mortgages being for purchase money, the other being to secure a loan. Small v. Hammes, 156 Ind., 556, 60 N. E., 342. Therein the court said: ''The ap-

pellant contends that the act cannot be so construed as to give the appellees an equity superior to the lien of the two chattel mortgages under which he claims title. The meaning of the statute is unmistakable. Its evident intention is to provide for the payment to the extent of $50 of the claims of wage earners out of the proceeds of the sale of the property of the employer, whose business has been suspended by the action of creditors, before the payment of any other claims, costs excepted, whether secured by lien or otherwise. Such statutes are said to be founded upon the broadest equity, and are for the protection of a peculiarly helpless and meritorious class of creditors, whose claims are usually small, and who are suddenly compelled to shift for themselves by the failure of their employer. If the statute does not, in terms, create a specific lien upon the property of the employer, it accomplishes the same result by securing to the employee priority of payment over all other claimants out of the proceeds of the property of the employer. The effect of the statute, as we construe it, is to give the appellees the right to priority of payment over the appellant, and to make the claim of the employees superior to the rights of the appellant under the mortgages executed by Jeffers. This being the necessary legal effect of the statute, is the act thereby rendered unconstitutional? It cannot be said to impair the obligations of contracts because it operates only on contracts entered into after its enactment. Jones v. Great Southern, etc., Co. (C. C. U. S.), 86 Fed., 370, 30 C. C. A., 108. Nor is it invalid on the ground that it divests vested rights. The Legislature has the power to regulate and control the priorities of all statutory liens, which may be created after the declaration of the legislative will, and every contract is presumed to be entered into with reference to existing laws. The lien of a chattel mortgage, where the property remains in the possession and use of the mortgagor, or his assigns, is quite as much a creature of the statute as the preference or priority of payment secured to the laborer or employee by the act under consideration," citing Phillips on Mech. Liens, sec. 30, and numerous cases.

It is true that the decisions in Small v. Hammes and Bell v. Hiner, were disapproved in McDaniel v. Osborn, (Ind.) 75 N. E. 647, 2 L. R. A. (N .S.) 615, decided in 1905. Therein the reasoning of the court was that the laborers' claims constituted merely "preferred" claims, and were subordinate to two earlier mortgages upon certain real estate of the employer. Emphasis was laid upon the fact that the statute did not, in terms, confer upon the laborer any "specific lien" of defined character upon property of the employer. That objection, even if meritorious, cannot be urged against said Texas statute of 1897, inasmuch as it expressly provided "a first lien" upon the affected property of the employer. Undeniably it is a *specific lien*. Matthews v. Burke, 32 Texas, 434. It is so treated in the majority opinion in the present case. See, also, In re Laird, 109 Fed. Rep., 550, quoted hereinafter.

In passing I note the fact that in McDaniel v. Osborn the mortgages were on real estate. And the fact remains that those earlier decisions had been rendered prior to the adoption of our said statute of 1897, and therefore should be considered as having been in the mind of our Legislature in the enactment of that statute.

Under an Illinois statute, Laws 1895, p. 242, similar to said Indiana statute, the Supreme Court of Illinois, in 1900, held that where an insolvent employer's property was sold under a chattel mortgage his employees, typesetters, cylinder feeders, pressmen, etc., were entitled to a prior lien on the surplus as against a second mortgage on the property executed after said statute became operative, but before any of the claims of the employees accrued. Heckman v. Tammen, 184 Ill., 144, 56 N. E., 361. The reasoning upon which that decision rests is as follows: ''The effect of the act is to create in favor of laborers and servants a statutory lien upon chattel property superior to the claims of other creditors in cases coming within the provisions of the statute. This is manifest from the language of the act. We must ascertain the intention of the Legislature from the language used, and we cannot interpolate exceptions or qualifications where none can be implied from a consideration of the entire act, or from it and other acts *in pari materia*. This legislation is remedial and should be liberally construed. In most cases such laborers have no available means to make secure their demands for labor. Such demands are usually small and payable at short intervals, and it is but the enactment of the simplest natural justice into law that when the chattel property used in the business is seized by creditors and the business is thereby suspended, such property should be held for the payment of such labor demands before other creditors are paid. Almost from time immemorial similar protection has been awarded to seamen. Nor is the chattel mortgage creditor thereby necessarily deprived of his security. He takes his lien with knowledge that if he permits the property to be so used and the debts to laborers to remain unpaid his security will be impaired to the extent of their unpaid demands. The provisions usually contained in chattel mortgages afford means for the protection and enforcement of his lien. Similar statutes in Indiana and Iowa have received similar construction. Reynolds v. Black, 91 Iowa, 1; Bell v. Hiner, 16 Ind. App., 184, 44 N. E., 576; Bass v. Doerman, 112 Ind., 390, 14 N. E., 377. See Buck v. Paine, 50 Miss., 684 52 id., 271.''

A Georgia statute provided: ''Laborers shall have a general lien upon the property of their employers, liable to levy and sale, for their labor, which is hereby declared to be superior to all other liens, except liens for taxes, the special liens of landlords on yearly crops, and such other liens as are declared by law to be superior to them.'' This seems to have been the act of 1869, but of that I am not certain, not having access to the Session Acts of that year, or of 1873, when

the Georgia laborer's lien statute seems to have been amended as least as to real estate.

In 1871, in a case arising under the laborer's lien law of that State, probably the statute quoted next hereinabove, it was held: "As to liens of equal dignity, they, by the code, section 1982, take rank, the oldest first. As to the other liens, including mortgages, judgments, etc., they yield to the laborer and mechanic, even though of older date, unless they be older than the Act of 1869." Association v. McGruder, 43 Ga., 9. In 1882 the Supreme Court of Georgia said: "Under this general exception it is insisted further by counsel for plaintiffs in error, that these laborer's liens cannot be enforced against *bona fide* mortgage creditors any more than they could against *bona fide* purchasers without notice. That they cannot be enforced against *bona fide* purchasers, is especially declared in Sec. 1976 of the code. but in Sec. 1974 it is provided that laborers shall have a general lien upon the property of their employer's superior to all other liens, except for taxes and such others as are declared by law to be superior to them; and mortgages are not so declared. Whilst this particular question has not been before this court since the act of 1873, fixing the liens of laborers, it was before it under the constitution of 1868, and the act of 1869 providing for these liens, and the ruling of the court will be found in the case of Stonewall Jackson Building and Loan Association v. McGruder, 43 Ga., 9. Under the act of 1869 laborers liens did not have the priority which is given them under the act of 1873, and yet it was held in the case referred to that as to dignity they were superior to judgments, mortgages, etc., which had to yield to the laborer and mechanic, even though such judgments and mortgages might be of older date. If. then, such priority was given to these liens under the act of 1869, there can be no question but that under the act of 1873 they are of higher dignity than mortgages, even though they may have been to *bona fide* creditors." Langston & Crane v. Anderson, 69 Ga., 65.

In 1890, in a case which arose under the above quoted Georgia statute, the same court said: "Mortgages are nowhere declared by law to be superior, and whether older or younger than the contract for labor makes no difference, provided they were not already in existence when the statute giving this lien to laborers was passed. The question seems virtually decided by Stonewall, etc., Ass'n. v. McGruder, 43 Ga., 9, and Langston v. Anderson, 69 Ga., 65. In the former of these cases McCAY, J., said, speaking of the act of 1869: 'We do not care to discuss the policy of this law, though we think it founded in good sense and based on a wise public policy. It is intended to secure a large class of poor people, dependent for subsistence upon the safe and speedy collection of their wages, a speedy mode of enforcing their just claims. It is intended also to give these dependent people a preference to ordinary debts. And

this, as we think, is also a wise public policy. These claims are generally small; they belong for the most part to persons who look solely to their daily wages for immediate subsistence, and if they lose that they are in want, and in danger of becoming a *public charge*. It is only in cases of insolvency that this preference can practically interfere with other debts, and the laborer very properly, in our judgment, is thought by the legislature to have the highest claim upon the assets of an insolvent debtor.' We quite concur in these views and have no doubt that the true construction of the act of 1873, as well as that of 1869, requires us to grade the general lien of laborers higher than the lien of ordinary mortgages, without respect to their comparative dates. Liens of the same class and character rank by their dates. But liens which exist by virtue of the nature and character of the indebtedness, and which the statute recognizes and favors for the advancement of public policy, do not lose their priority by reason of being younger than others of a different kind. We are of opinion that in this case the proceeds of the personalty before the court should have been appled to the laborer's lien in preference to the mortgages." Allred v. Haile, 84 Ga., 570, 10 S. E., 1095.

In a case decided in 1899, which arose under said Georgia statute, which seems to have been carried forward, without change, in the Civil Code, as Section 2792, the Supreme Court of that State held the lien of a job printer thereunder superior to the lien of a mortgage older in date than the contract for labor and given, just as in the case at bar, to secure purchase money on the property against which the printer sought to enforce his lien. The court said: "It seems to be the settled law of this State that the lien of an ordinary mortgage is inferior to the general laborer's lien upon the same property, although the mortgage is of older date than the contract of labor. Association v. McGruder, 43 Ga., 9; Langston v. Anderson, 69 Ga., 65; Allred v. Haile, 84 Ga., 570, 10 S. E., 1095. It is contended, however, that this rule is not applicable in the present case, because the mortgage in this case was given to secure the payment of the purchase money on the property upon which the laborers' liens are sought to be enforced. We know of no law which places a purchase-money mortgage upon personalty upon any different footing, in regard to the matter now under consideration, from that of an ordinary mortgage upon such property." Georgia Loan, etc., Co. v. Dunlop 108 Ga., 218, 33 S. E., 882.

Of course that Georgia statute gave to the statutory laborer's lien precedence and priority, in legal effect, as against said contract lien; but such, in my estimation, is, also the favored *status* of said lien of Nichols, under our Act of 1897, although its phraseology was slightly different from that of said Georgia statute. In any event our Legislature evidently undertook to follow said Georgia statute *in principle,* and to give to our laborer's lien precedence and priority

over such chattel mortgages, as uniformly had been done in Georgia since 1869, and for years in various other States.

An Ohio statute of 1883 providing laborers liens directed that "in all cases where property of an employer is placed in the hands of an assignee, receiver or trustee, claims due for labor performed, within the period of three months prior to the time such assignee, receiver or trustee is appointed shall be first paid out of the trust fund, in preference to .all other claims against such employer, except claims for taxes and costs of administering the trust." Thereunder the Circuit Court of Appeals of the United States for the sixth circuit, in 1901, in an opinion by Judge Day, said: "As the statute reads, claims of all classes are to be postponed to the labor claims accruing within the period mentioned, whether the same have theretofore constituted liens upon the property or not. It is the manifest purpose of this statute to give this class of claims a preference over all other demands whatsoever with the exception of taxes and costs of administration. We learn from the agreed statement of facts in this case that the receiver, after his appointment on August 27, 1898, and before any interference to acquire the estate for the trustee in bankruptcy, had reduced the property of the insolvent to money, and had a fund in his hands more than sufficient to pay these labor claims which had been duly filed with him. Independently now of any effect which the bankruptcy proceedings may have upon the question of the standing of these claims as a lien upon the fund, it is apparent that it is the purpose of the Ohio statute, when property of an employer shall be placed by assignment or receivership beyond the reach of those who may have assisted in its creation by their labor to the extent of claims which have accrued within three months prior thereto, to fasten upon it a charge which shall yield in priority of payment only to taxes and costs of administering the trust. This being the object and purpose of the statute, it seems to us tantamount to charging upon such funds, a specific lien in favor of this class of creditors. Persons who deal with an employer after the passage of this statute must be held to know that, in case the property is placed in the hands of an assignee or receiver, the resulting fund from the administration of such trust shall first be subjected to the payment of such liens. Such a charge is in fact a lien." In re Laird, 109 Fed. Rep., 550.

Under the Kentucky laborer's lien statute of 1903 an employee in a sawmilll was held entitled to priority, in payment of wages, over an earlier mortgage upon the plant. The court said: "No constitutional provision is infringed by the statute; and as manufacturing plants are only valuable as going concerns, and cannot be operated, without material and employees, it is therefore the policy of the law to secure employees a prior lien for their wages for a limited period. See Wimberly v. Mayberry (Ala.), 10 South., 157, 14 L. R. A., 305." Graham v. Lbr. Co., 118 Ky., 192, 80 S. W. 799.

A New Jersey statute, as amended in 1887, provided, in substance, that in case of insolvency of a corporation laborers then and theretofore in its employ should have a lien upon the *assets* of the corporation for the amounts due them, respectively, which should be paid prior to any other debt of the company. Thereunder claims of laborers were held inferior to a mortgage on land of the corporation recorded before the laborers' debts accrued. Hinkle v. Trust Co., 47 N. J. Eq., 333, 21 Atl., 861. The court said: "The receiver takes the property subject to the mortgage. In his hands it is *an asset* only to the extent of the equity of redemption. The title is in the mortgagee." (Italics mine.) In Texas title to mortgaged property is not in the mortgagee, but in the mortgagor. That New Jersey decision, and others in that State, recognized the priority of the statutory lien *to the extent of the "assets."* Our statute of 1897 gave, not merely "a lien" on mere "assets" of the owner, but "a first lien" on the affected *property* itself, whether mortgaged or not. In the cited case the controlling inquiry was, to what did the laborers' lien attach? The court having found that because of the peculiar phraseology of the statute, the lien attached to only the owner's equity of redemption in the mortgaged land, the statutory lien could not, logically, have been intended to take precedence over the earlier mortgage lien. Like reasoning controlled the later decision under the same statute, in Wright v. Iron Company, 48 N. J. Eq., 29. Therein the court said: "The statute gives to laborers a lien upon the assets of an insolvent corporaton which shall come to the hands of a receiver, and their claims are to be paid from such assets in priority to other creditors. Those assets consist of the property of the company, subject to all liens existing thereon, at the time which the court adjudges to be the time of the corporation's insolvency. The priority secured to laborers is priority over the debts which are payable out of the corporation's property after the liens existing upon it at the adjudication of insolvency shall have been discharged."

In a case wherein the rights of the parties were fixed prior to the Massachusetts statute of 1897, ch. 400, to which I have not access but which seems to have given at least to debts not exceeding $100 due to operators, clerks, and servants, for labor performed within one year next prior to the appointment of a receiver, priority over other unsecured claims, the Supreme Judicial Court of that State held in 1898, that where a receiver was appointed to take possession of the property of a corporation and distribute its funds among creditors such clerks, operators, and servants were entitled to such priority in equity and in analogy to results under insolvency laws. A dissenting opinion rested upon the propositions that equity was powerless to award such preference in the absence of a statute authorizing it, and that the insolvency laws were inapplicable in such receivership proceedings. Jones v. Pub. Co., 171 Mass., 22.

In the same year, 1897, both Massachusetts and Texas *wrote into their statutes* measures of protection for people in such walks of life. To all such statutes, in varying forms, fair and full effect should be given, by the courts, to effectuate the humanitarian design of the law-makers. The requirement of our statute on construction is: "In all interpretations, the court shall look diligently for the intention of the Legislature, keeping in view at all times the old law, the evil and the remedy." R. S. art. 5502. Here the proffered remedy is "a first lien" on the affected property—yet a majority of this court hold it to be only a subordinate and inferior and, in this instance, a *second* lien. By the same logic, under other circumstances, it might be a fifth or a twenty-first lien. Such a result clearly was not in contemplation of the law-makers, who, I assume, attempted in good faith, and without injustice to lienors acquiring liens after the Act should become operative, effectually to correct the evils at which our said Act of 1897 was levelled.

The foregoing reflex of some of the statutes and decisions in other States perhaps will serve to illustrate antecedent legislation upon the subject, and the drift of awakened public sentiment thereon, generally, when our own law-makers undertook to deal with it, in 1897; and from the purpose and operation of similar laws in other States we may gauge, fairly, the fundamental purpose and the controlling principles which our own Legislature sought to weave into said Texas statute of that year. That the general effect of such legislation, in other States, as reflected in the authoritative decisions of courts of last resort in those jurisdictions, respectively, supports the construction which I place upon our statute of 1897 cannot justly be denied.

Not always, as in the case at bar, has this court so rigorously restricted the operation and effect of statutory liens. It held, in 1879, that the Act of April 4, 1874, gave to landlords in towns and cities, as well as in the country, a lien upon goods, wares, and merchandise in rented premises to secure rents that might become due, etc., although that statute expressly declared that the therein conferred "preference lien upon the property of the tenant hereinafter indicated . . . shall apply only to animals, tools, and other property furnished by the landlord to the tenant and to the crop raised on such rented premises." Rosenberg v. Shaper, 51 Texas, 134. It was contended that the preference lien did not apply to landlords in *towns and cities,* inasmuch as the statute contained the above quoted restrictive provision. The court rested its decision upon certain details of that Act, and declared it the duty of the court "to so construe the statute as to uphold every provision as far as possible," and that "to do this, we should look to it as a whole, and endeavor to carry out the evident intention of the Legislature in the light of the surrounding circumstances and the object intended to be accomplished." The court said: "That this pre-

ference lien was intended to apply to goods, wares, and merchandise as a class, is, by a familiar rule of construction, (*exceptio firmat regulam in casibus non exceptis*), necessarily implied, by the language in the proviso, that it shall not attach to the goods, wares, and merchandise of a merchant, trader, or mechanic, sold and delivered in good faith in the regular course of business; and, that it was intended to apply to property generally, is implied by the terms of the second and third sections of the act, which require the distress warrant to issue, commanding and making it the duty of the officer to seize, without reservation, the property of the defendant.'' In that case the intent of the Legislature to extend to the town or city landlord the benefits of such lien was not nearly so clear as was its purpose, by said Act of 1897, to confer upon artisans, etc., ''a first lien'' superior to chattel mortgage liens taken after that statute became operative. Here, as there, but more certainly, is applicable the quoted maxims of the law: *An exception confirms the general rule in cases not excepted.*

In said Act of 1874, now R. S., Art. 5475, and also in our Act of 1897 and our Act of 1889, now R. S., Art. 5490, the lien given to the landlord is designated simply as ''a preference lien.'' Unlike said laborer's lien Act of 1897, none of said statutes contains, in a proviso or otherwise, any exception or restriction or limitation whatever concerning the full operation of the statute, as related to the priority of the lien therein provided. Because of that difference the present issue of priority in liens is not controlled by decisions construing and applying said landlord's lien statutes, although they are entitled to consideration as sidelights. Thus there remains for this court the duty of construing said Act of 1897 according to its own terms, including its provisos. But, while considering, for the indicated purpose, the phraseology of said landlord's lien statutes and the constructions which they have received from our courts, it is well to get them in proper perspective.

Concerning priorities, as related to duly registered chattel mortgages, the established legal effect of said landlord's lien statutes may be stated thus:

First. If the chattel mortgage be executed upon property not then upon or within the rented premises, and, after execution of the mortgage but during the term, such property be moved upon or into the rented premises, the mortgage lien is entitled to priority over the landlord's lien.

Second. If the chattel mortgage be executed prior to the beginning of the term and upon property then upon or within such rented premises the mortgage lien is entitled to priority over the landlord's lien for rents for such subsequent term.

Third. But where the chattel mortgage is executed during the term and upon property then upon or within the rented premises the landlord's lien is entitled to priority over such mortgage. Dur-

ham v. Flannagan, 2 App. C. C., 25, (1883); Association v. Cochran, 60 Texas., 620, (1884); Marsalis v. Pitman, 68 Texas., 627, (1887); Brackenridge v. Millan, 81 Texas., 17, (1891); Furniture Co. v. Hotel Co., 81 Texas., 141, (1891); Rogers v. Grigg, 29 S. W., 654, (1895); Harvey v. Wilder, 131 S. W., 851, (1910); Low v. Mchy. Co., 160., 160 S. W., 136, (1913); Oakes v. Freeman, 204 S. W., 360; Burger v. Barry, 211 S. W., 457. See, also: Austin v. Welch, 72 S. W., 883, (1903).

In Durham v. Flannagan the mortgage upon the crop was executed by the tenant during the term. Held: the landlord's lien upon the crop took precedence of the mortgage.

In Rogers v. Grigg is was held that where mortgaged chattels were on leased land when the mortgage was executed, the burden is on the mortgagee to establish priority of his lien over that of the landlord, and that a landlord's lien for rent is superior to that of a chattel mortgage made during the term, although when the mortgage was made, no rent was due.

In Harvey v. Wilder, the tenant, to secure indebtedness for supplies furnished in 1907, mortgaged his crop to be raised in 1908 on a rented farm. During 1908 the tenant borrowed from a bank money for which he gave his note signed by the landlord as surety. Subsequently the tenant delivered three bales of cotton to the landlord and directed him to sell it. After doing so the landlord deducted his rent and tendered the residue of the proceeds to the tenant who directed the landlord to apply same in payment of the note to the bank, which he did. Held: "It could not be said that the appellant was liable to the mortgagees for the conversion of the cotton. Appellant was the landlord, and had a superior statutory lien on the cotton for his rent, and only applied to his own use and benefit the amount of the rent due and owing him, and gave to the tenant, who directed the sale, the entire balance. The tenant was entitled to receive the entire balance of the proceeds of the sale as against appellant. Having a superior landlord's lien, and the tenant consenting at the time to the sale, the appellant could legally sell the cotton and not be liable for conversion of the sale of the same on the mere fact of selling."

In Austin v. Welch the chattel mortgage was executed during the term upon property then on the rented premises, and was not filed "forthwith" as provided by law. Held: The chattel mortgage was void as to the landlord, he being a lien "creditor" in contemplation of our chattel mortgage statute. However, even had the mortgage been filed "forthwith," the lien created by it would have been inferior to the landlord's lien, the mortgage having been executed during the term.

In Low v. Machy. Co., it was held that the effect of the proviso in Art. 5490 is to prevent a landlord from asserting a claim of lien for more than one year's rent to become due in future, thus divid-

ing, so far as such lien is concerned, a contract for a term of years into a series of yearly contracts (citing Allen v. Brunner, 73 S. W., 821); and that "as the laundry company's mortgage was recorded prior to the commencement of the second year of the contract, that company was, as to appellant's statutory lien for that year, a prior creditor within the purview of article 5654 of the Revised Statutes of 1911, and therefore the trial court ruled correctly in holding that appellant's lien for the rent for the second year was subordinate to the laundry company's mortgage lien."

In Association v. Cochran the tenancy was from month to month. In September, 1879, when the mortgage upon personal property then within the building was executed and recorded, all rents then due, including rent for the current month, had been paid in full, and all rent thereafter accruing down to September, 1880, was paid as it became due. The suit of the landlord was for rents for September, October, and November, 1880, and to enforce a statutory landlord's lien therefor upon said personal propery. The lien of the landlord was held subordinate to the mortgage lien. The court said: *"No basis existed upon which to predicate any claim of a lien upon the property in favor of the landlord when the mortgage was executed,"* citing Green v. Bear Bros., (5 Tex. Law. Rev., 597) 2 Posey's U. C., 372. (Italics mine.)

In Marsalis v. Pitman, the lease was for eight months, rental being payable monthly. Held: A tenant could not, by making a sale in bulk of a stock of goods in the leased premises, defeat the landlord's lien thereon for rents accruing thereafter within the term. The decision, like that in Livingstone v. Wright, 68 Tex., 706, differs from that in Green v Bear, in so far as the extent of such lien is concerned; but that is not material in the present inquiry. The court declined to approve all that was said in Association v. Cochran, but analyzed the facts in that case and impliedly approved the holding therein that the mortgage lien was superior to the landlord's lien. And the court, through Judge Stayton, said: "If the rule, as we understand it to be established by the Legislature, unduly restrains trade or in any other respect operates harshly, the Legislature will, when called to its attention, no doubt made such changes, if any, as ought to be made; but the courts can do no more than to administer the law as they find it."

In Brackenridge v Millan, a tenant from month to month executed on the first day of the term, a mortgage upon a soda fountain outfit then within the rented premises. The mortgage lien was held superior to the landlord's lien for rent for a month subsequent to that during which the mortgage was executed. citing Association v. Cochran, *supra*.

In Oakes v. Freeman, the lease contract was not made until more than four months after execution and registration of the chattel mortgage. The court said: "The trial court decreed a priority to

110 Tex.—3.

the mortgage lien. It is believed that the trial court did not err, for the mortgage lien was acquired prior to the making of the lease contract," citing Brackenridge v. Milan.

In Burgher v. Barry, 211 S. W., 457, Childress, the owner of a storehouse, rented it to Davis for one year from May 12, 1914. Afterward, by agreement of the parties, Fox was substituted as sole lessee. On July 16, 1914, Fox purchased from Grossman Company a soda fountain and appliances, and executed a chattel mortgage thereon for purchase money. Three months later Fox, being unable to pay for said property, redelivered it to the Grossman Company, who, on that date sold it to Shahada, who, on the same day, executed, in favor of the Grossman Company, a chattel mortgage on said personal property for purchase money. Shahada left said property in said storehouse. On December 3, 1914, the Grossman Company paid to Childress the full amount of rent due by Fox, who, from that date, ceased to be a tenant of Childress. Thereafter, on the same day, Childress rented the storehouse to Shahada who immediately entered into possession and became the sole tenant of Childress. On June 15, 1915, Shahada owed Childress rent due for four and one-half months. The appeal was from that part of the judgment which is in favor of Childress based on a cross action. The court said: "The only question for decision on appeal is as to the priority of liens. According to the findings of fact, Grossman Company had a chattel mortgage lien on the property which was executed by Joseph Shahada on October 16, 1914; and the rental contract between defendant in error Childress and Joseph Shahada originated and began on December 3, 1914. At the time of the rental contract of December 3, 1914, the defendant in error Childress had been paid in full all rent due him to that date. In these facts it is believed that the chattel mortgage lien is superior to and has priority over any lien in this case of the landlord Childress," citing Brackenridge v. Millan.

In Furniture Co. v. Hotel Co., the chattel mortgage, given pursuant to prior agreements, was executed during the term. The landlord's lien was held superior to the mortgage lien. In discussing the nature and dignity of the landlord's lien the court said: "His lien is superior to that of an attaching creditor. Sullivan v. Cleveland, 62 Texas, 677. . . . The landlord's lien attaches independent of and without judicial process. The law gives it. The levy of the process would add nothing to it so far as the right is concerned. . . . It arises from the relation of the parties under the agreement and from the status and situation of the property as defined by law," citing cases. See, also: Polk v. King, 48 S. W., 601. If all that be true of a lien which the statute merely designates "a preference lien," what is the nature of, and what dignity should be ascribed by the courts to, an artisan's lien under said Act of 1897, which expressly designates it as "a first lien" and in

said provisos rivets upon it that meaning? Why should it not be held superior to a contract lien executed in contemplation of it?

By the above mentioned decisions our courts are committed to the view that as to any and all rents accruing within the term during which the chattel mortgage upon personal property then upon or within the rented premises was executed and duly registered the landlord's lien has priority over the mortgage lien; although as to rents accruing during a subsequent term such chattel mortgage has priority over the landlord's lien. Thus, as was intimated in Association v. Cochran, the issue of priority in liens seems to turn upon whether, when the chattel mortgage was executed, there did or did not exist a rational and proper basis "upon which to predicate any claim of a lien upon the property in favor of the landlord." In other words, the issue of priority appears to turn upon whether, under all the facts and circumstances of the particular case, the chattel mortgage was or was not executed and duly registered "in contemplation of the operation of the particular landlord's lien upon the particular property. In instances of the latter above-mentioned character, wherein the chattel mortgage lien is held entitled to priority over the landlord's lien, it cannot fairly be said that the mortgage was taken in contemplation of the landlord's lien for rents accruing during a subsequent term, or in other words, with the expectation on the part of the mortgagee that there would be a subsequent term and that the mortgaged property would remain within the leased premises after the expiration of the term during which the mortgage was executed. On the other hand, in instances of the former above mentioned character, wherein priority is given to the landlord's lien, it must be assumed, in the light of the facts, that the chattel mortgage was taken in contemplation of that particular landlord's lien for rents accruing during the current term, and with the reasonable expectation upon the part of the mortgagee that the mortgaged property then upon or within the rented premises would remain there throughout such term.

Unlike our landlord's lien statutes, said Act of 1897 was not formulated with reference to lease terms of definite duration, but the lien thereby given was intended to operate continuously. For that reason, in testing priorities, a chattel mortgage taken after that Act became operative should be held to have been taken with a view to any and all circumstances involving the affected personal property which reasonably might arise at any time during the life of such mortgage.

Undeniably, in the case at bar, it must be presumed that when the mortgage upon the press and engine was executed that was done in full contemplation of the possibility of a future statutory artisan's lien upon that property; or in other words, with the reasonable expectation upon the part of the mortgagee that the mortgagor

would employ printers to perform the work for which the printing plant was designed and operated, and that in the event of default in prompt payment of their wages they might and would claim and fix upon the affected property of the employer, including such press and engine, statutory liens, under said Act of 1897, for their unpaid wages. "The mortgage was subject to the provisions of the existing laws." Ellis v. Vernon I. L. & Water Co., 86 Texas., 113.

"If it appears that the intent of the statute was to give a lien as against all persons, this intent will prevail as against a prior mortgage. . . . The Statute, and not the agreement of the mortgagor, creates the lien. The statute being in force when the mortgagee took his mortgage, it in some sense entered into the contract of mortgage." Jones on Ch. Mtgs., sec. 474.

Obviously, therefore, the lien here asserted by Nichols is more nearly analogous to the landlord's lien asserted in said former class of cases, wherein the lien of the landlord is awarded priority over the lien of the mortgagee; wherefore, here, as there, the lien of Nichols, under said Act of 1897, should be held superior to the chattel mortgage lien.

Accordingly, in my opinion, said certified question should be answered affirmatively.

The majority opinion herein does not seem to me to carry convincing force. Apparently it ignores the second proviso of the Act; but, relatively, that is unimportant.

In declaring that "the Act does not purport to give priority to the employees' liens," and in reiterations of that view, it practically asserts that "first" does not imply priority. A conflicting view is thus expressed in the best law-book in the world: "the last shall be first and the first last." Matthew 20, 16. Of course, if that word is to be eliminated as wholly meaningless and immaterial, the conclusion of the majority follows, with some plausibility; but not otherwise can that conclusion reasonably be maintained.

The assertion, with reference to landlord's liens, that "nothing is better settled in Texas than that this *preferred lien* is subordinate to pre-existing mortgages" fails, it seems to me, to reflect, properly, the effect of the decisions on that subject, as I have endeavored, hereinabove, to show.

No reasonable analogy arises under R. S. Art. 5664, giving to agisters, etc., "a special lien," there being therein no declaration of preference or priority. The argument that because, in certain statutes, the lien therein conferred was expressly declared to be "prior to all others" the mere omission of that particular phraseology from another statute creating a lien of a different character indicates a legislative purpose to deny to such new class of lien just such rank and dignity, although such lien is expressly designated as "a first lien," seems to me to be illogical and unsound. The Legislature is not restricted in the use of English words.

"Things that are equal to the same thing are equal to each other." in law, as in mathematics. That is true of all statutes, whether contemporaneous or not. Not all statutes of even the same Legislature are drawn by the same legislator; and if they were, might he not reasonably expect similar results from the use of practically synonymous expressions? There is, in my opinion, no foundation for the assumption that said Act of 1897, if construed in accordance with my theory of its legal effect, would "override subsisting rights," inasmuch as it does not purport to affect liens in existence when it became a law. Between said Act of 1897 as construed by me and R. S. 1879, Art. 3190, Art. 5671, R. S. 1911, I see no conflict; but if such conflict exists the later Act should control. In recent years that rule of construction has, indeed, been somewhat discredited in this court; nevertheless I still consider it sound. Said earlier statute still should be treated as speaking from its original date, although brought into the revision of 1911. Said revision itself plainly so declares, in general terms. Final Title, sec. 16.

The California statute which provides that different liens shall have priority according to the dates of their creation "other things being equal" merely declares a general rule of law to which I assent; but I am unable to see that it has any reasonable application to the present issue of priority as between a mere contract lien, such as said chattel mortgage carries, and a statutory lien which the law of its creation denominates "a first lien." Here, "other things" are not equal. In Wilson v. Donaldson, the California court did hold the laborer's lien inferior to the lien of a chattel mortgage which was executed and registered before the grain was ready for harvesting, but an examination of Deering's Civil Code, Cal., 1909, sec. 3051-2, under which that case arose, shows, and that court indicated, that it was doubtful whether the laborer was within any of the favored classes. If he was, it was under the clause which declared: "a person who makes, alters or repairs any article of personal property, at the request of the owner or legal possessor of the property, has a lien on the same for his reasonable charges for work done and materials furnished and may retain possession of the same until all the charges are paid." Citing Douglas v. McFarland, 92 Cal., 656, the court said: "For the purposes of the case alone it may be conceded he is entitled to a lien;" but priority was denied him. The court evidently went its full limit in favor of the laborer, but found it impossible to award him a priority which was not conferred upon him, or even hinted, by their statute, in which respect it was essentially different from our Act of 1897. Should that case control this court in determining priorities in the case at bar? I think not.

An excerpt is made from a Michigan decision, also, Denison v. Shuler, in which a mechanic's lien for repair of a chattel was

held subordinate to a prior duly recorded mortgage thereon for purchase money. I have not access to the Michigan statute as amended in 1873, under which that case arose, but it seems that it merely conferred ''a lien'' upon the affected personal property and authorized the beneficiary to retain possession pending payment of his claim. That much is indicated in the opinion in that case, and that is the effect of Sec. 25, ch. 245, Comp. L. Mich. 1915, notations to which refer to said amended Act of 1873. No priority is suggested by that statute. Clearly, therefore, the Michigan court would not have been justified in decreeing priority to the lien of the mechanic. Should this court, because of that decision, now here deny to the lien asserted by the printer priority over the asserted chattel mortgage lien? I am unwilling to give that decision such effect.

The purpose and intent with which our Texas Legislature enacted said statute of 1897 is neither shown nor controlled by the quoted argument of the Supreme Court of Michigan, in Denison v. Shuler, which is adduced, in said majority opinion, as presenting cogent reasons for the assumed failure of our Legislature to make said artisan's lien superior to such a chattel mortgage lien. Said Act of 1897 speaks for itself. Said majority opinion in the case at bar, while not denying the authority of the Legislature to do what I insist it did do by said Act of 1897, concedes that reasons can be assigned which might have induced our Legislature to give to the lien provided by said Act priority over such chattel mortgage liens. Moreover, as I have shown, Legislatures of other States already had adopted and their courts had upheld and construed similar statutes conferring such priority. Furthermore, our Legislature was the sole and final judge of that question of mere expediency.

The stated assumption that our said Act of 1897 was of doubtful meaning, as to priority of the lien which it gave, which assumption, alone, renders the quoted expressions in said Michigan opinion at all applicable or pertinent, in the present case, is one which I consider utterly untenable; yet, undeniably, upon that assumption has been built up the entire argument and the decision of the other members of this court. Logically the superstructure should fall along with the destruction of the foundation upon which it rests.

The most striking feature of said majority opinion is the analysis of results which it presents to depict an absurd operation of said Act of 1897, as a predicate for the stated conclusion that any construction requiring such operation must be erroneous. Apparently it is presented as a compelling and conclusive reason for the decision. An obvious and very simple answer, on the facts, is that the landlord, being the assumed owner of the farm implement, would have no lien upon it; whereupon the bogy vanishes. In that assumed case, and under my construction of said Act of 1897 priorities would be easily determinable.

But, even if instead of such *implement* there be substituted cotton produced for the tenant in whole or in part by the labor of the farm hand, and subject to the lien of a duly filed chattel mortgage executed by the landlord and filed for registration prior to the beginning of the lease term, said cotton being subject to a statutory landlord's lien also, thereby bringing the assumed case within the terms of said Act of 1897, an obvious and simple answer is that full effect should be given to the latest expression of the legislative will concerning priorities of such liens. Accordingly the lien of the landlord would be inferior to the lien of the mortgage, but superior to the lien of the farmhand. (Sec. 1, proviso.) The lien of the farm-hand, being thus subordinate to the lien of the landlord, necessarily, by implication, would be subordinate to the superior lien of the mortgagee, also, although but for said proviso the lien of the farm-hand would be, by the general provisions of the statute, superior to the lien of the mortgagee. Thus the assumed difficulties in foreclosure of liens are entirely dissipated. That illustrates the prime function of said proviso. It creates an exception or limitation where, otherwise, none would exist. Another answer is that if the terms of a proviso really conflict with the plain general provisions of a statute the proviso, to that extent, should be treated as inoperable and of no force or effect. The proviso, rather than the great body of the statute carrying the main features of the enactment, should yield.

The expressed view that the mortgagee in the present case had acquired prior to the employment of the printer "vested rights" in the press and engine, which would be diminished or destroyed by giving priority to the printer's lien, seems to me to imply that such construction of said Act of 1897 would render it unconstitutional. That, as I understand it, is neither the ground of the decision, nor the view of any member of this court; and, if it were, manifestly it would be unsound, and contrary to practically all the authorities. Griffie v. Maxey, 58 Texas, 214; Ellis v. Water Co., 86 Texas, 109; Hubbell v. Railway Co., 126 S. W., 313; Loan Co. v. Skellett Co., 124, Minn., 144, 144 N. W., 750; Garr v. Clements, 4 N. D., 562, 62 N. W., 640.

The declaration to the broad effect that most of the courts of last resort in the United States have declined to give such priority to statutory liens in favor of employers is, indeed, tempered by the phrase "in the absence of clear language requiring it;" but the crux of the question before us is whether our statute of 1897 does or does not substantially, in terms, expressly confer such priority upon the lien which it gives to employees. In my judgment, based upon diligent and repeated research, the great number and weight of authorities in the United States support my construction of that statute. I have not found one single case in which a substantially similar statute has been construed and applied in accordance with

the conclusions expressed in said majority opinion; and therein no such case is cited. The cited note in L. R. A. 1918 C, 1024 refers to a number of cases in support of the proposition that "where the statute creating the lien is silent on the question the lien does not take priority over an existing mortgage." Some of the cases cited in said note go to the extent of holding that to give such priority such legislative intent must appear clearly. To all that I agree; but in our statute those requirements are, I think, fulfilled. To substantially the same effect is the cited note in L. R. A. 1915D, 1153-4 in which, however, is cited Installment Co. v. Skellet Co., (Minn), *supra,* wherein it was held that under a statute giving a lien for transportation or storage of personal property a lien on household furniture for transportation, and storage was superior to a prior duly filed chattel mortgage executed after the enactment of the statute. The note makes no specific reference to any language in the statute conferring such priority, but presumably the statute embodied some provision of that character. The same note cites Loan Association v. Saul, 34 Misc., 188, 63 N. Y., Supp., 837, wherein a statutory warehouseman's lien was held superior to the lien of a prior mortgagee. I am unable to see how any of the authorities cited in said majority opinion supports the conclusion therein announced, except upon the hypothesis that our statute of 1897 is destitute of all provision for priority of the lien which it gives; and that, in turn, presents, anew, the main issue embodied in said certified question.